1-10-1-2-1-0, Humana v. Defconn, Majewski Good morning, Justices. My name is Derek Storm. Good morning, Counsel, Mr. Lee, Mr. Barber. Good to see you here today. I represent Humana. It's our appeal. I will – the issue in this case is whether Mr. Majewski is permanently disabled from all gainful employment from a medical perspective. Humana – excuse me – Majewski, in his brief at page 22, conceded that there wasn't sufficient evidence introduced at trial to establish that Mr. Majewski was permanently disabled in the odd-lot category. Consequently, I will limit my comments to the medical-only permanent total. As this Court is well aware, the standard for establishing that a claimant is permanently disabled from a medical perspective was articulated by the Illinois Supreme Court in the case of Valley Mold and Iron Company v. the Commission. In that case, the Supreme Court stated that for a claimant to establish an entitlement to permanent total disability benefits from a medical perspective, the evidence must clearly establish that the claimant is, quote, obviously unemployable, period, unquote. The Supreme Court went on to state that just because a claimant can't perform strenuous physical labor does not entitle him to an award of permanent total disability benefits in this category. The Court stated that when the medical experts agree that the claimant can perform some type of light duty, then he is not obviously unemployable and therefore not entitled to permanent total disability benefits. In this case, when the Court, reviewing the transcript of trial, will note that there were three doctors who testified. All three doctors either released him to return to work in a light physical demand level or deferred an opinion on that. The opinion of those physicians is corroborated by the surveillance tapes which were introduced into evidence which clearly established that the claimant was able to perform activities in the light physical demand level. Thus, applying the Supreme Court's analysis to these facts, it leads inescapably to the conclusion that this claimant is not obviously unemployable and therefore is not entitled to permanent total disability benefits. What did Dr. Bernstein testify to? Did he give an opinion in favor of the claimant? Under his direct examination, yes, Justice, he did. But if we're only going to limit the analysis to the direct examination, why bother having him testify? As this Court is well aware, five experienced attorneys, the best way that our system has for challenging the opinion, testing the opinion of an expert, is cross-examination. And if we're going to ignore it, then let's not do it. What did he say in cross-examination? Did I quote that opinion? I will quote to you. This is at page 25 and 26 of my brief. Under cross-examination, he was asked the following questions and gave the following answers. Now, you indicated that you have not had the opportunity to review Dr. Anderson's reports. He opined that in his opinion, Mr. Ryjewski could return to work in an appointment position if he was allowed to change positions frequently with no lifting over 20 pounds. Answer from Dr. Bernstein. Yes. Question. Would you agree or disagree with that, doctor? At least attempt to return to work cut off. Answer. I don't think a position like that would be dangerous to the patient, but I do think it would cause increased complaints of pain. Question. But there is no contraindication from a medical perspective from him returning to work in such a position. Answer from Dr. Bernstein. Yes, as a light-duty position. That testimony of Dr. Bernstein in cross-examination was not retracted, was not changed under redirect examination. He didn't change it under recross examination. That was the last word from Dr. Bernstein regarding the ability of Mr. Ryjewski to return to work. Yes, in a light-duty position. Let's assume that, you know, I don't dispute it. I think that's accurate. You've got the claimant testify. He experiences pain every day. He takes narcotics. He takes sleeping pills. They interfere with his thought process, his concentration, his sleep deprivation. So the commission couldn't take that in conjunction with Bernstein's opinion and say that he's totally disabled? I'm going to submit to you that Bernstein's opinion is that he can return to work light-duty. So if we go now to the medication side of the analysis, I'm going to ask you. Wait a minute. Hold on. Hold on. Bernstein is saying that he can return to light-duty work and it's not going to cause him any increased danger. But how much pain does he have to sustain before he can't work at all? Justice, I think this is a part of Justice's opinion, a question here. The pain element. He's under the care of a pain management physician, Dr. Norrin. Dr. Norrin is the one prescribing these drugs that are allegedly causing confusion, impairment. Dr. Norrin was asked under direct examination, can Mr. Rajewski return to work? And Dr. Norrin said he could function in a sedentary capacity. But he did not state that because of the drugs I'm prescribing for him, the pain medication drugs which are to control his pain, obviously, that he's precluded from returning to work. He could have made that statement. He did not make that statement. At the end of the day, when you read pages 963 to 966 of Dr. Norrin's testimony, he stated that he would defer to Dr. Bernstein regarding the claimant's ability to return to work. He never testified that because of the pain medication, Mr. Rajewski was, quote, obviously unemployable. Dr. Bernstein never testified that because of either the limitations of the surgery that he performed or the pain medication, that Mr. Rajewski was obviously unemployable. Neither one of those physicians provided that testimony. Norrin did testify that there's a good probability that functioning in a light-duty capacity would likely increase his pain, didn't he? Yes, he did. And he also testified, Your Honor, that he would need constant ongoing pain management. But he never once said that given those two facts, that functioning may increase his pain and that he needs ongoing pain management, that that would preclude him from returning to work. Is there a body of law, does the employee have to be reduced to total physical incapacity in order to qualify for permanent total? No, Your Honor, no. And if he would, if we're talking about the odd lot category, no, he doesn't have to be reduced to total physical incapacity. In the odd lot, you prove an odd lot, permanent total, by a diligent but unsuccessful job search, through expert vocational testimony, or a combination of those two. But in this case, Mr. Rajewski admitted he undertook no job search. They didn't present any expert vocational testimony that he was unable to return to work, given his medical restrictions, background, education, and training. So we're reduced solely to the medical-only permanent total, and the standard by the Supreme Court was obviously unemployable. And when you have the two physicians we spoke about, one deferring to the surgeon, and the surgeon saying he can return to work in a restricted capacity, albeit light duty, according to the Supreme Court, he's not obviously unemployable. Now, if you add to that… Can't the commission take the medical evidence that it received, along with his testimony about his pain and so forth, and looking at the evidence as a whole, determine that he's obviously unemployable? Yes, Your Honor, they could. And if there's some evidence to support that, then we're obligated to uphold that. Yes, Your Honor, and I agree with that. But I'm going to submit to you that let's take the return to work part. There is no evidence to say that he can't return to work. All the doctors testified he could return to work in a restricted capacity, 20 pounds lifting, changed position frequently. So we have the physical parameters of his return to work. The medical side, the medication side. Who's the person that should answer that question? That would be the doctor prescribing those medications. That's Dr. Noren. He's asked, point blank, can he return to work? And his answer is he can function in a sedentary capacity, but at the end of the day, I'll defer to Dr. Bernstein regarding his ability to return to work. So the commission can't make something out of whole cloth. If Dr. Noren had said, you know, these prescription medications impaired his ability to function, and that coupled with limitations on his physical activity could limit his ability to return to work, that's really vocational testimony, not medical testimony when you take those two pieces together. And they didn't present any vocational testimony to put those two pieces together. What the commission actually did, you read the arbitrator's decision, which was adopted by the commission, the arbitrator said the effects of the prescription medications are well known to everyone. Well, they're not well known. I submit to you that you need evidence. I can't rebut what the arbitrator knows in his head. I can't rebut things that aren't brought to the table to be exposed to the light of day and challenged. That's not common knowledge. That's not something the arbitrator has the expertise to opine on. That should have been the doctor who's prescribing the medications rendering that opinion. And that should be the burden of the claim. It should be the burden of the claim. Correct, Your Honor. The testimony of Dr. Anderson, who, in my humble opinion, is probably one of the most well-respected, highly-credentialed doctors in this area, after reviewing, after examining Mr. Rejewski on several occasions and viewing the surveillance tapes, which, by the way, neither Dr. Noren nor Dr. Bernstein ever reviewed, stated that Mr. Rejewski could return to work in a restricted capacity, 20 pounds lifting, ability to change positions frequently. Now, what do we have to support that conclusion? This Court will look at the videotapes. Those videotapes clearly establish that he's, Mr. Rejewski, at least capable of performing up to that level, if not in excess of that level. That's one piece of evidence that supports this. And the interplay between the videotapes and the medication, I think, is important for this Court to understand. Commission's decision, in part, was premised upon a finding that the prescription medication somehow impaired Mr. Rejewski's ability to return to work. No medical evidence to support that. But what do we have to rebut that? On the surveillance tapes, Mr. Rejewski is performing all the activities of daily living that you and I do every day. He's driving a car. He's going to the bank. He's running errands. There's no confusion, no manifestation of impairment noted on those surveillance tapes. How can you say that somebody can't work because of the confusion caused by prescription medication, yet he can drive an automobile on a constant basis? You can't reconcile the facts with what the Commission found in this case. Did he testify that this medication affects his concentration? He did, Your Honor. And it affects his thought process? He did, Your Honor. And he also said that it also results in extreme sleep deprivation? He did, Your Honor. And the Commission found him credible? I'm sorry? They found him credible? Implicitly. They didn't make a specific finding, but I would say implicitly they found him credible. Counsel, you have time on rebuttal. Thank you. Counsel, please. May it please the Court. My name is Harry Lee. I represent the employee, Stephen Rieske. In response to Justice Houghton's last question, the arbitrator actually did find the testimony of Mr. Rieske to be very credible in this case, and that was adopted by the Commission in this case. What I think is You're saying that testimony from the claimant satisfies the requirement that the claimant has to show the effect of medication and we don't need a doctor to address that? No, no, no. I'm just merely responding to what Justice Hoffman asked about the credibility finding in this case. I think in this case what we have is a simple matter of conflict in the medical evidence. And the medical evidence in this case is basically Dr. Bernstein versus Dr. Anderson. Dr. Bernstein did testify that in his opinion Mr. Rieske was permanently and totally disabled. Was there an alleged waffling on cross-examination? Well, you know, he never withdrew that opinion, nor did he ever, and this is important, never did he release Mr. Rieske to return to work. His restrictions remained the same. And I think if you look at that passage in the cross-examination and you follow it from start to finish, you'll see that the opinion has never changed because he was specifically asked, it's your opinion that Mr. Rieske is permanently disabled? His answer to that was yes. And then he went on further and he was asked about his current restrictions, and he said, yes, my current restrictions are based on the accident which occurred in April of 2001, the subsequent treatment, which was unsuccessful. Mr. Rieske went through a number of attempts to relieve his pain. Nothing was successful. And finally, you know, he basically said that there was nothing in my estimation to change his decision to leave the hospital. And he said, no, I don't think there is anything in my estimation to change my opinion, particularly since Mr. Rieske testified to all these current complaints. Now, the current complaints were pretty significant. Mr. Rieske in particular talked about his deprivation of sleep. He said on a good night, he was able, only able to get three and a half hours of uninterrupted sleep because of his pain. But with regularity, he was unable to get any sleep whatsoever. As a result of this inability to get sleep, he found himself laying around the house all the time, laying around the house in his sweats, and he had to take constant naps because of the pain which caused the deprivation in his sleep. So this is the condition this man is in. Now, he could drive a car, but he also testified that when he drove a car, he had to make sure that he was in either the inner lane or the outer lane so that if he developed this serious cramping that he had with frequency on a daily basis, he could pull over and get out of the car and stretch out or whatever he needed to do. So he could drive the car, but with this certain limitation. In terms of his daily activities, this is a man who played golf three times a week for 20 years. After this incident, he played golf, he tried I think once or twice, and that was about it. This is a man who went to the health club and walked on the track and he did various other light exercises when he was at the health club. After this particular incident, he could only go to the health club and he would sit in the steam room and he would sit in the whirlpool and that was the extent of his activity there. This man was severely impacted by the injury and he was severely affected by this constant pain that he had. And the pain was an integral ingredient of the assessment that was made by Dr. Bernstein in this case. Plus Dr. Noren testified that what was limiting Mr. Rieske in this case was the pain that he had. And with the credibility determination on the pain in this case, you know, it's hard to see how this is nothing, how this could be anything but a question for the commission to resolve. And in this case, the commission did resolve the conflicting evidence in favor of Mr. Rieske. In terms of the case law, I think that the Peabody case and the Navistar case perhaps not precisely factually the same. These cases are essentially the same. They talk about situations where there is conflicting evidence and who it is who resolves questions, conflicting evidence questions, and it is the commission. And it is the commission that properly resolved those questions in Mr. Rieske's favor here. And we're asking this Court to affirm the commission. No further questions. Thank you. Thank you, Your Honor. Thank you, Counsel. Mr. Radjuski testified the problems that he experienced due to the pain and medications. I ask you to compare that to what's shown in the videotapes. He says one thing, but he does another. I say look to the deeds, not the words. Dr. Noren said that his pain would limit him. But Dr. Noren was asked expressly to give an opinion as to whether that pain or the pain medication would limit Mr. Radjuski or preclude him from returning to work. He said he can function at a sedentary capacity. I will defer to Dr. Bernstein regarding his actual ability to return to work. So he was given the opportunity to address that under direct examination. He chose not to. He did not give testimony that he's obviously unemployed. And that brings me to the Valley Mold case. I think it's instructive for us to look at the facts of the Supreme Court decision of Valley Mold. And I'll do it very briefly because I know my time is limited. In that particular case, the claimant was a manual laborer, spoke English as a second language. He worked as a skimmer at the time of his accident, which was, by all accounts, a highly physical but very low-skilled position. While performing his job, he suffered a stroke. As a result of the stroke, he lost control and strength of all of his limbs. His doctors, however, testified that he could work in a light physical capacity. The commission, with that evidence, found that claimant to be permanently disabled. The Illinois Supreme Court vacated that decision and said when a physician opines that a claimant can work in a light physical demand level, he is not entitled to permanent disability benefits in the medical category. He is not obviously unemployed. That's the only Supreme Court who made that finding. Let's compare that claimant to Mr. Ryjewski. Mr. Ryjewski has a B.A. in business administration from Loyola University. He is a public-trained accountant, a long and varied work history in the insurance and banking industry. He's released to return to work light physical duty. The vice president of the respondent testified that but for his voluntary retirement, as of the date of trial, he'd still be working for Humana. The respondent presented vocational evidence that given his background, his education, and his medical restrictions, that there were numerous employment opportunities for Mr. Ryjewski, and there's no vocational testimony on the other side to rebut that. It's inconceivable to me that Mr. Ryjewski is found to be permanently disabled, yet the claimant in Valley Mold is not permanently disabled. I ask that this Court follow the lead of the only Supreme Court to find that Mr. Ryjewski is not obviously unemployable from a medical perspective, and that's what we're limited to, vacate the Industrial Commission, excuse me, the Workers' Compensation Commission's decision, remand this with instructions to assess permanency outside the permanent disability category. Thank you for your time. The Court will take the matter under review for disposition.